# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                                )
LAURA SACKS, Regional Director, Region          )
1, National Labor Relations Board, for and on   )
Behalf of the NATIONAL LABOR                    )
RELATIONS BOARD,                                )
                                                )
                 Petitioner,     )
                                                )
          v.                             )     Civil Action No. 23-12368-MJJ
                                                )
I.N.S.A., INC.,                                 )
                                                )
                 Respondent.     )
_____)

## MEMORANDUM OF DECISION

May 14, 2024

JOUN, D.J.

I.N.S.A., Inc. ("Respondent") is a retail cannabis company with multiple storefronts, including one in Salem, MA. [Doc. No. 1-16 at 5]. In December 2021, United Food and Commercial Workers International Union, Local 1445 (the "Union") began an organizing campaign among Respondent's Salem employees. [*Id.* at 8]. One month later, the Union sent employees a website link to sign cards authorizing Union representation. [*Id.*]. By January 12, 2022, the Union had collected authorization cards from 20 employees—a majority of the Salem store's 28 employees at the time. [*Id.*]. On January 14, 2022, a group of employees presented Respondent with a Demand for Recognition letter. [*Id.*]. And on January 18, 2022, after Respondent did not recognize the Union, the Union filed a petition for an election with the

National Labor Relations Board ("NLRB").  [*Id*. at 9]. However, when the election came to pass in May 2022, the Union lost. [*Id*. at 3-4].

Beginning in February 2022 and continuing over the next several months, the Union filed charges before the NLRB alleging that Respondent had engaged in unfair labor practices in violation of the National Labor Relations Act ("the Act"), such that the election process had been frustrated. [*Id*. at 2]. Following hearings in February and April 2023, the Administrative Law Judge ("ALJ") found that Respondent had "committed certain serious unfair labor practices shortly after the petition was filed" that required several remedial actions, including issuing a cease-and-desist as well as a bargaining order. [*Id*. at 3].

On October 13, 2023, NLRB Regional Director for Region One, Laura Sacks ("Petitioner"), filed the instant Petition for temporary injunctive relief under Section 10(J) of the Act. [Doc. No. 1]. As set forth below, Petitioner has shown reasonable cause to believe that Respondent has committed unfair labor practices at its Salem store and has made a strong showing that the issuance of a temporary injunction is just and proper. Thus, the request for temporary injunction is <u>GRANTED</u>.

## I.    FACTS

I take the facts principally from the Administrative Law Judge's Decision, as well as the administrative record and supplemental evidence from the parties. *See* [Doc. No. 26].

### A.  Organizing Efforts and Demand Letter

In December 2021, employees Adam Lynch and AJ Parker began discussing organizing a union at Respondent's Salem store.  [Doc. No. 1-16 at 8]. Lynch contacted the Union and spoke with Megan Carvalho, who launched the organizing effort. [*Id*.]. Parker also set up a chat using the Signal app; by January 12, 2022, 22 employees were participating in the group chat. [*Id*.].

In mid-January, the Union provided these employees with a link to electronically sign a card authorizing representation by the Union. [*Id*.]. By January 12, 2022, the Union had collected authorization cards from 20 employees—a majority of the Salem store's 28 employees at the time. [*Id*.]. On January 14, 2022, a group of employees presented Respondent with a Demand for Recognition letter, signed by all 20 employees who had digitally signed authorization cards.[1] [*Id*.]. The presenting group included Lynch, as well as employees James Bagnall and Rowan Cummings. [*Id*. at 8-9]. The letter was presented to store manager Marc Rialdi, who forwarded it to corporate managers Morgan Carlone and Stephen Lemieux. [*Id*. at 9]. The letter requested Respondent to contact Carvalho within three days to recognize the Union, but Respondent did not do so. [*Id*. at 8-9]. On January 18, 2022, Carvalho filed the petition for election in this case. [*Id*.].

### B.  January 15 Discipline of Lynch

In November 2021, Respondent had hired Ryan Darling as human resources manager to monitor employee attendance and issue appropriate discipline. [*Id*. at 9]. Under Respondent's attendance policy, employees are assessed "occurrences" for unexcused absences and tardies. [*Id*. at 6]. On December 19, 2021, Rialdi issued Lynch a written warning for his 8.5 occurrences from earlier in the year. [*Id*.].

On January 10, 2022, Darling instructed Rialdi to review records for employees with attendance issues and address any overlooked occurrences. [*Id*.]. On January 13, 2022, Darling and Rialdi spoke regarding Lynch's continued attendance issues. [*Id*.]. Lynch had incurred an unexcused absence on December 18, 2021, as well as tardies on December 27, 2021, and January 1-2, 2022. [*Id*.].

---

[1] While 21 employees signed authorization cards and provided their signatures for the demand letter, only 20 of those employees were eligible to vote. [*Id*. at 9 n.10].

On January 14, 2022, after receiving the Union's demand letter, Rialdi asked Carlone whether he should hold off on issuing discipline to those employees who had signed the letter. [*Id*.]. Rialdi noted that he had to do "research" but was "pretty sure" they were going to further discipline Lynch, who had handed him the demand letter. [*Id*.]. Carlone instructed Rialdi to issue "any pending attendance documents." [*Id*.]. On January 15, 2022, Rialdi issued Lynch a final warning for his occurrences from December 18, 2021, through January 2, 2022. [*Id*.].

### C.  January 28 Discipline of Parker and Cummings

As of November 2021, Respondent's policy required that the door to the Cash Room—a secure area where cash is taken and stored until it is picked up for deposit—always be kept closed, including when people are inside. [*Id*. at 6-7, 14]. On November 19, 2021, Lemieux instructed store managers to make sure secured doors were locked at all times, emailing, "I also expect that you will have no tolerance for violations of this policy going forward." [*Id*. at 14]. The next day, Rialdi forwarded this email to Salem assistant store managers and leads, noting that the "cash office door" in particular should be kept locked. [*Id*.].

Despite these emails and policies, managers and leads (including Rialdi) were known to continue leaving the Cash Room door open while inside, without repercussions and on a daily basis. [*Id*. at n.22]. The door would be left open for better airflow, as well as to better listen to what was happening on the sales floor. [*Id*. at 14].

On January 12, 2022, manager Kendal Wagoner observed Parker in the Cash Room with the door open, and she reported this to Carlone. [*Id*.] On January 14, Rialdi received the demand, and he texted Carlone, "Found out that AJ [Parker], My lead, is behind all of this! He has organized it all. And Rowan [Cummings] my other lead is also involved and has been pressuring people." [*Id*.] He later texted, "At this point I don't know who to trust? I think Syd

[Saynganthone] is fine (I think!!??) I know Nick [Novello] was close to [former assistant manager Sara Dukeshire] and has had conversations with Rowan when [Dukeshire] was fired so I'm not 100% there." [*Id*.]

Carlone later reported to Darling about Parker leaving the Cash Room door open, and Darling ordered a review of surveillance from January 12 through January 20. [*Id*. at 15]. It was observed that Parker, Cummings, Novello, and Saynganthone each left the door open at least twice. [*Id*.] On January 28, 2022, Respondent disciplined all four employees for violating the Cash Room door policy. [*Id*.] This was the first time anyone was disciplined for violating this policy. [*Id*.] Saynganthone, Parker, and Cummings each received a final warning. [*Id*.] Novello was discharged because he had previously received a final warning. [*Id*.]

Later that day, Parker complained to Darling about the final warning. Darling emailed Parker inviting him to continue the conversation, stating that he wanted to "get to understand the changes that [Parker] would like to see happen" and that he believed he could "offer an objective opinion and assist both sides to start to hear and understand each other." [*Id*.]. They spoke again the next day, and Parker was particularly critical of Rialdi's performance as store manager. [*Id*.]. Darling responded there was only so much he could do. [*Id*.].

### D.  February 4 Discipline of Bagnall

On December 19, 2021, Rialdi issued Bagnall a documented discussion for his three unexcused absence or tardy occurrences throughout the year. [*Id*. at 10]. Then on February 4, 2022, Respondent issued Bagnall a final warning for eating in "the Vault" on January 16—a room where cannabis products are stored prior to purchase—in violation of Respondent's food and beverage policy and its COVID mask usage policy. [*Id*. at 6-7, 15]. Surveillance video showed Bagnall eating a popsicle in the Vault with his mask down. [*Id*. at 15]. This was the first

time Respondent disciplined an employee for violating either policy. [*Id*. at 15-16]. Managers and employees, including supervisor Kathleen Clough, regularly drank and ate in the vault without repercussions. [*Id*. at 16]. The discipline was issued by Rialdi and Darling, allegedly based on the "severity" of Bagnall's violations, despite the fact that he had no prior discipline other than his documented discussion for attendance. [*Id*. at 15]. Unlike with the Cash Room, Respondent did not conduct a broader investigation and review surveillance to determine if others were violating the policies at issue. [*Id*. at 16].

### E.   February 4 Discharge of Lynch

That same day, Respondent discharged Lynch for a verbal altercation with a customer from January 4, 2022, one month earlier. [*Id*.]. A customer had refused to properly wear her COVID mask, despite a request from Parker, and Lynch yelled that she did not have the right to risk employees' health. [*Id*.]. He did not use profanity, but he pointed his finger and clenched his fist up in the air, and the customer cursed him out. [*Id*.]. The exchange lasted just over a minute. [*Id*.]. Neither Parker nor Lynch reported the incident to management. [*Id*.].

Rialdi testified that he learned about the incident through Clough at the end of January, at which point he interviewed Parker and Lynch separately, on January 27, 2022. [*Id*.]. Lynch continued to work for another week after the interview. [*Id*.], Rialdi then consulted with Darling, and they decided that Lynch's conduct warranted discharge—unrelated to his prior attendance issues. [*Id*. at 16-17 and n.27].

### F.   February 16 Discharge of Bagnall

In early February 2022, Bagnall's schedule underwent several changes, causing him to alternate between working nights and mornings and to work shifts that were not normally his. [*Id*. at 18]. On February 9, 2022, Bagnall did not report to the start of his 6 a.m. shift. [*Id*.]. Upon

being contacted by his supervisor Clough, Bagnall said he did not know he was scheduled to work but would come in right away; he arrived about 2.5 hours late and was permitted to work additional hours to make up for his missed time. [*Id.*]. Clough gave no indication Bagnall would be disciplined. [*Id.*].

On February 16, 2022, Darling emailed Bagnall that he was being terminated. Darling stated, "After reviewing your previous infractions and considering that you have had three company policy violations in the span of a month, we have made the decision to terminate your employment." [*Id.* at 18-19]. This included the February 4 final warning for violating the food and beverage policy and the COVID mask policy. [*Id.* at 19].

### G.  March 11 and March 13 Restrictions on Union Activities and Discussions

On March 11, 2022, Rialdi called Parker to his office and said that he "should not be talking about the Union while on the clock," and that it was making other employees uncomfortable. [*Id.* at 19-20]. Rialdi also stated, "While you're here, you should be focused on what you're doing here." [*Id.*]. During this time, employees were permitted to discuss other non-work topics, such as the news or their personal lives, while on the clock and during downtime. [*Id.*].

A few days later, Clough called Parker into her office and said he needed to "chill out with the union stuff" and that his "social media posts were making people uncomfortable." [*Id.* at 20]. Parker responded that Rialdi had spoken to him a few days prior and that he did not understand where this was coming from because he was not taking time away from work. [*Id.*]. Clough then backed off and stated she supported the organizing effort. [*Id.*].

### H.  Election

At the time the election petition was filed, 28 employees were eligible to vote. [*Id*. at 3]. The mail ballots were sent out on April 15, returned by May 6, and counted on May 9. [*Id*.] By the time of the election, that number grew to 38 employees. [*Id*.]. The initial tally of ballots showed that of the 38 eligible voters, 11 votes were cast for and 13 votes were cast against the Union, with six challenged ballots. [*Id*.]. Four of the challenged ballots were later resolved by the Regional Director. [*Id*.] On May 26, 2022, a revised tally showed that 11 votes were cast for and 17 votes were cast against the Union, with two challenged ballots. [*Id*. at 4].

### I.  ALJ Decision

This case was tried on February 7-10, 2023, and April 3-5, 2023, before an ALJ. [*Id*. at 2]. On September 21, 2023, the ALJ issued a decision finding Respondent in violation of Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the Act. [*Id*. at 43]. The ALJ ordered Respondent to cease and desist from various unfair labor practices, which included—but was not limited to— prohibiting employees from discussing the Union or engaging in union activity during working hours, unfairly disciplining or discriminating against employees involved in unionizing efforts, and refusing to recognize and bargain with the Union. [*Id*. at 45]. Regarding specific employees, the ALJ ordered Respondent to, within 14 days, offer Lynch and Bagnall full reinstatement to their former positions and make them whole for loss of earnings and benefits. [*Id*. at 45-46]. He also ordered Respondent to remove from its files any reference to the unlawful discipline of Cummings, Parker, and Bagnall, and the discharge of Bagnall and Lynch. [*Id*. at 46].

### J.  Appeal and Petition for Temporary Injunctive Relief

Respondent has filed exceptions appealing the ALJ's decision to the NLRB, and that appeal remains pending. [Doc. No. 22 at 8]. On October 13, 2023, Petitioner filed the instant

Petition for temporary injunctive relief in the interim, under Section 10(J) of the Act. [Doc. No. 1].

### K.  Respondent's Declaration

On November 2, 2023, Respondent's Chief People Officer, Michael Byrd, submitted a declaration stating that, of the 21 employees who had submitted authorization cards and signed the demand in January 2022, only two remain employed at Respondent's Salem store. [Doc. No. 22-15 at ¶ 3]. Of the 28 employees who had voted in the election in May 2022, only eight remain employed at Respondent's Salem store. [*Id*. at ¶¶ 4-5]. As to management, Rialdi and Clough are no longer employed by Respondent, and Byrd noted that Respondent hired new store managers for the Salem store. [*Id*. at ¶¶ 9-11].

Byrd further represented that, on October 16, 2023, Respondent had sent letters to Lynch and Bagnall, offering to reinstate them to their prior positions, [*Id*. at ¶ 6]. On October 30, 2023, Lynch responded via email and declined the offer. [*Id*. at ¶ 7]. Bagnall's letter came back from the U.S. Post Office stating that he is no longer at the address on file, and Respondent does not have a current address for him. [*Id*. at ¶ 8]. Representatives for Respondent and Petitioner also exchanged emails regarding reinstatement, wherein Respondent stated, "Adam Lynch and James Bagnall are willing to waive reinstatement in consideration for front pay." [Doc. No. 22-5 at 4].

## II.   STANDARD

Under Section 10(j) of the Act, "a Regional Director may petition a federal district court for interim injunctive relief pending the NLRB's final resolution of an alleged unfair labor practice." *Murphy v. NSL Country Gardens, LLC*, No. 19-cv-10145, 2019 WL 2075590, at *2 (D. Mass. May 10, 2019). To resolve a Section 10(j) petition for temporary injunctive relief, a district court in the First Circuit considers two issues: (1) whether Petitioner has shown that there

is "reasonable cause to believe" a respondent has violated the Act, and (2) whether temporary injunctive relief is "just and proper." *Pye ex rel. N.L.R.B. v. Excel Case Ready*, 238 F.3d 69, 72 (1st Cir. 2001).

First, the district court may not decide the merits of any unfair labor practice claims. Rather, "reasonable cause" merely requires that "the Board's position is fairly supported by the evidence." *Pye ex rel. N.L.R.B. v. Sullivan Bros. Printers*, 38 F.3d 58, 63 (1st Cir. 1994) (cleaned up). "Courts should not resolve contested issues of fact and should defer to the characterization by the Board of the facts as long as the characterization is 'within the range of rationality.'" *Kreisberg v. Emerald Green Bldg. Servs., LLC*, 169 F. Supp. 3d 261, 266 (D. Mass. 2015) (quoting *Rivera–Vega v. ConAgra, Inc.*, 70 F.3d 153, 158 (1st Cir. 1995)). And "the legal and factual determinations of the ALJ are instructive to the Court." *Walsh v. W.B. Mason Co.*, 219 F. Supp. 3d 209, 215 (D. Mass. 2016).

Second, to show injunctive relief is just and proper, Petitioner must prove the elements of a preliminary injunction: (1) a likelihood of success on the merits[2]; (2) the potential for irreparable injury in the absence of relief; (3) that such injury outweighs any harm preliminary relief would inflict on the defendant; and (4) that preliminary relief is in the public interest. *Excel Case Ready*, 238 F.3d at 73 n.7. "Courts in this Circuit have customarily recognized … the retaliatory termination of union employees as unfair labor practices for which § 10(j) interim injunctive relief is appropriate." *Murphy*, 2019 WL 2075590, at *2.

---

[2] The First Circuit has noted that this element may render superfluous the inquiry into reasonable cause. *Excel Case Ready*, 238 F.3d at 72 n.5. In addition, "[w]hen, as in this case, the interim relief sought by the Board 'is essentially the final relief sought, the likelihood of success should be *strong*.'" *Sullivan Bros. Printers*, 38 F.3d at 63 (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 29 (1st Cir. 1986)).

III.    ANALYSIS

A.  Reasonable Cause

Petitioner contends that Respondent has violated Sections 8(a)(1), 8(a)(3) and 8(a)(5) of

the Act. Section 8(a)(1) forbids an employer from interfering with, restraining, or coercing

employees in the exercise of their right to organize. Section 8(a)(3) makes it unlawful to

discriminate against employees regarding the terms and conditions of their employment with the

purpose of discouraging union activity. And Section 8(a)(5) forbids an employer from refusing to

bargain collectively with the representatives of their employees. I am satisfied that Petitioner has

shown reasonable cause to believe Respondent has committed unfair labor practices in violation

of all three provisions, as the allegations are fairly supported by the evidence in the record.

As set forth above, and as the ALJ found, the record tends to establish that Respondent

violated the Act through efforts to suppress union organizational activity, including but not

limited to: (a) soliciting grievances and impliedly promising improved benefits and conditions of

employment if employees refrain from union organizational activity, through Rialdi's actions on

January 28-29, 2022; (b) prohibiting employees from talking about the union during working

time while permitting employees to talk about other subjects, on approximately March 11 and

15, 2022; (c) prohibiting employees from engaging in union activity during working hours, as

opposed to just working time, on March 11, 2022; (d) telling employees that talking about the

union made other employees uncomfortable, on approximately March 11 and 15, 2022; (e)

enforcing work rules and policies concerning attendance, food and beverage, Cash Room door,

and mask usage selectively and disparately by applying them more strictly against employees

involved in unionizing efforts, on various dates since January 14, 2022; and (f) issuing final

warnings to employees and discharging employees, including Adam Lynch and James Bagnall,

11

because of their union activity, on various dates. The record also fairly supports Petitioner's position that Respondent violated the Act by refusing to recognize and bargain collectively with the Union since receiving the January 14 demand letter that demonstrated majority support.

Respondent argues that Petitioner cannot satisfy reasonable cause because Petitioner's case "depends entirely" on the standard set forth in *Cemex Construction Materials Pacific, LLC*, 372 NLRB No. 130, 2023 WL 5506930 (Aug. 25, 2023). In *Cemex*, the NLRB announced a new framework for issuing remedial bargaining orders. In relevant part, upon receiving a union's majority-supported demand for recognition, an employer must promptly either recognize the union or file a petition for an election, unless the union has already filed a petition. *Id*. at 25. "However, if the employer commits an unfair labor practice that requires setting aside the election, the petition (whether filed by the employer or the union) will be dismissed, and the employer will be subject to a remedial bargaining order." *Id*. at 26. Here, the ALJ concluded that "Respondent committed certain serious unfair labor practices shortly after the petition was filed, that, under *Cemex*, require setting aside the results of the election and issuing a remedial bargaining order." [Doc. No. 1-16 at 3].

Respondent hypothesizes *Cemex* will likely be vacated by the federal courts, thus Petitioner's case must fail.[3] I decline to consider this argument. In the context of reasonable cause, the Court grants deference to Petitioner's legal theories, particularly where Petitioner and the ALJ duly applied a standard already established by the NLRB. *See Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147, 1150 (D. Mass.), *aff'd sub nom. Fuchs v. Jet Spray Corp.*, 725 F.2d 664 (1st Cir. 1983) ("On questions of law, petitioner's view should be sustained unless the court is convinced it is wrong."); *see also Boire v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen &*

---

[3] Of note, the standard advanced in *Cemex* affects only Petitioner's allegation that Respondent violated the Act by failing to recognize and bargain collectively with the Union; other alleged unfair labor practices are unaffected.

*Helpers of Am.*, 479 F.2d 778, 789 (5th Cir. 1973) ("[T]he Board should be accorded the opportunity to pass initially on questions involving the construction of the N.L.R.A.," particularly "[w]here the legal questions resolve around the substantive validity of unfair labor practice theories"); *McLeod v. Bus. Mach. & Off. Appliance Mechanics Conf. Bd*, 300 F.2d 237, 242 (2d Cir. 1962) ("We must … defer to the clear purport of Board precedents, whether we believe them right or wrong"). With deference to Petitioner's legal and factual position, as well as the ALJ's determinations, I find reasonable cause to believe Respondent committed unfair labor practices in violation of the Act.

### B. Just and Proper

Having found reasonable cause to believe that Respondent committed unfair labor practices, I must now decide whether the relief requested by Petitioner is "just and proper."

### i. Likelihood of Success

First, I find that Petitioner is likely to succeed on the merits. Most significantly, the ALJ issued a thorough ruling in favor of Petitioner on September 21, 2023, which "strongly supports Plaintiff's case and is a good indicator that [s]he is likely to succeed." *Walsh v. Liberty Bakery Kitchen, Inc.*, No. 17-cv-10721, 2017 WL 2837006, at *1 (D. Mass. June 30, 2017); *see also Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001) ("Having presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the [petitioner's] prospects of success may be weighed."). As discussed above, the ALJ's conclusions are supported by the evidence in the record—including his conclusion that Respondent committed serious unfair labor violations following the Union's filing of a petition for an election with the NLRB, which, under *Cemex*, requires setting aside the results of the election and issuing a remedial bargaining order. [Doc. No. 1-16 at 3].

Respondent again bases its argument largely on its conjecture that *Cemex* will be overturned and that the ALJ's grant of injunctive relief will be overturned. This argument does not address Petitioner's request for injunctive relief outside of the bargaining order, including the request for a cease and desist and for offers of reinstatement to Lynch and Bagnall. In any event, I will not opine on the likelihood of *Cemex*'s overturn. *Cemex* is not the case before me, and any such opinion from this Court would be mere fortune-telling. Suffice it to say that under the standard currently in place by the NLRB—i.e., the standard set forth in *Cemex*—the Petitioner demonstrates a strong likelihood of success on the merits.

### ii. Irreparable Harm

Second, the potential for irreparable harm in the absence of preliminary relief favors Petitioner. Injunctive relief should only issue if circumstances show "a danger of irreparable harm or the necessity of preserving the status quo," where the status quo is "the one which existed prior to the commission of the unfair labor practices"—in this case, when the Union made its demand for recognition in January 2022. *Jet Spray Corp.*, 560 F. Supp. at 1155.

The First Circuit has described the rationale for issuing an interim bargaining order as follows:

> If an employer faced with a union demand for recognition based on a card majority may engage in an extensive campaign of serious and pervasive unfair labor practices, resulting in the union's losing an election, and is then merely enjoined from repeating those already successful violations until final Board action is taken, the Board's adjudicatory machinery may well be rendered totally ineffective. … Even if the Board finally orders bargaining, probably close to two years after the union first demanded recognition, the union's position in the plant may have already deteriorated to such a degree that effective representation is no longer possible.

*Pan Am. Grain Co.*, 805 F.2d at 27 (quoting *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 37–38 (2d Cir. 1975)). The record here demonstrates that Respondent engaged in serious unfair labor practices, resulting in a coercive effect on employees by the time of the election and likely

14

causing the reversal of the Union's majority support. Over two years have passed since the

Union first demanded recognition. By the time the NLRB orders bargaining, employee support

likely will have further "erode[d] to such an extent that the Union could no longer represent

those employees." *Asseo v. Centro Medico Del Turabo*, 900 F.2d 445, 454 (1st Cir. 1990)).

Under these circumstances, an interim injunctive relief is needed to preserve the meaningfulness

of a bargaining order.

       Further, Respondent's unfair labor practices included disciplining and terminating

employees for actively supporting the Union. "Because the disappearance of the 'spark to

unionize' may be an irreparable injury for the purposes of § 10(j), the district court does not

abuse its discretion when evidence shows that the discharge of union supporters has delayed or

halted the unionization effort." *Excel Case Ready*, 238 F.3d at 75 (further noting "the fear of

employer retaliation after the firing of union supporters is exactly the 'irreparable harm'

contemplated by § 10(j)"). On this basis, the First Circuit has upheld a district court's order to an

employer to cease and desist from further unfair labor practices and offer reinstatement to

employees discharged for their union activity. *Id*. Petitioner has similarly demonstrated

irreparable harm to the collective bargaining process here, meriting injunctive relief in the form

of offers of reinstatement to Lynch and Bagnall and a posted cease-and-desist order. Respondent

notes that Lynch and Bagnall have already been offered reinstatement, and they have declined.

But as Petitioner noted at oral argument, Respondent offered reinstatement to an environment

lacking the other requested interim injunctive relief. Lynch and Bagnall should be given the

chance to consider whether they would like to return under the protection of a 10(j) order.

Further, even if they ultimately decide against returning, the inclusion of reinstatement in the

public injunctive order will combat the chilling effect among the remaining employees from their initial discipline and termination and help restore the status quo.

I am unconvinced by Respondent's argument that Petitioner cannot obtain an injunction due to her own delay in filing the instant petition. Following the demand for recognition in January 2022, the Union continuously filed unfair labor practice charges requiring additional investigation through July 2022. Respondent notes that the NLRB authorized filing a 10(j) petition in this case on January 17, 2023. [Doc. No. 22-1 at ¶ 5]. This was followed by hearings before the ALJ in February and April 2023. The *Cemex* decision was issued in August 2023, and the ALJ issued his decision in September 2023. The petition was filed in October 2023. I find that it was reasonable for Petitioner to delay filing until after the issuance of the *Cemex* and ALJ decision. *See Frankl v. HTH Corp.*, 650 F.3d 1334, 1363 (9th Cir. 2011) ("By awaiting the ALJ decision, the Director made the District Court's task in evaluating the propriety of interim relief much easier, and much more likely to be carried out accurately…"); *Hirsch v. Konig*, 895 F. Supp. 688, 697–98 (D.N.J. 1995) ("[T]he Board wanted to satisfy itself that the Health Care & Retirement Corp. decision was not going to dictate a contrary result in this case. In addition, the Board has explained that it was waiting for ALJ Alemàn's decision …. Here, the Board's caution before pursuing section 10(j) relief was well-warranted because it enabled the administrative hearing process to unfold, which has resulted in creating a careful record of decision before the ALJ well beyond the ordinary complaint upon which 10(j) relief may be sought.").

### iii.   Balance of Hardships

Third, the balance of hardships favors Petitioner. Any harm the company might suffer from a temporary injunction is inherently limited, as it "will only last until the Board's final determination." *Pan Am. Grain Co.*, 805 F.2d at 28.  Further, "when the [employer] is not

compelled to do anything except bargain in good faith, the risk from a bargaining order is minimal," as the employer is not required "to do anything that would cause it harm; it need do nothing more than follow the ordinary obligations of an employer under the law." *Walsh*, 2017 WL 2837006, at *2 (quoting *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1196 (9th Cir. 2011)). In the absence of injunctive relief, Respondent "would reap the benefit of having committed unfair labor practices while the union would be forced to wait for reinstatement, with its support waning in the interim." *Id.*; *see also Pye v. Excel Case Ready*, No. 00-cv-10603, 2000 WL 33351822, at *5 (D. Mass. May 8, 2000) ("The failure to demonstrate promptly that effective action can and will be taken to remedy apparent unfair labor practices, including illegal firings, may be fatal to the possibility of a free and fair process for determining whether employees … wish to unionize. The absence of a Temporary Injunction will also probably eviscerate reinstatement as a practical remedy …. In contrast, if those employees are reinstated, [defendant] will again have the services of good workers…"). As such, any potential hardship to Respondent is outweighed by the potential hardship to be suffered by the Union and employees.

### iv.  Public Interest

Fourth, the public interest supports granting preliminary relief here, as "the public has an interest in ensuring that the purposes of the Act be furthered." *Pan Am. Grain Co.*, 805 F.2d at 28. I therefore find that the relief requested by Petitioner is just and proper.

## IV.   CONCLUSION

Accordingly, Plaintiff's Petition for Temporary Injunction [Doc. No. 1] is <u>GRANTED</u>. It is ordered that, pending the final disposition of the matters involved currently before the NLRB, Respondent shall:

1. Cease and desist from:

   (a) Disciplining, discharging, or otherwise discriminating against employees because of their union or other protected activity;

   (b) Soliciting grievances or complaints from employees and impliedly promising increased benefits and improved terms and conditions of employment if they refrain from union organizational activity;

   (c) Prohibiting employees from talking about the Union during working time while permitting employees to talk about other subjects;

   (d) Prohibiting employees from engaging in union activity during working hours, as opposed to just working time;

   (e) Telling employees that talking about the Union made other employees uncomfortable;

   (f) Selectively and disparately enforcing work rules and policies by more strictly applying them to employees who formed, joined, or assisted the Union;

   (g) Failing and refusing to recognize and bargain collectively and in good faith with the Union as the exclusive collective-bargaining representative of all full-time and regular part-time retail associates, retail leads, retail inventory specialists, and inventory leads employed at Respondent's Salem, Massachusetts location; and

   (h) In any other manner unlawfully interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act:

   (a) Immediately recognize and upon request bargain collectively and in good faith with the Union as the exclusive collective bargaining representative of all full-time and regular part-time retail associates, retail leads, retail inventory specialists, and inventory leads employed at Respondent's Salem, Massachusetts location, and if an understanding is reached, embody the understanding in a signed agreement;

   (b) Within five (5) days of the District Court's Injunction Order, offer, in writing, interim reinstatement to employees Adam Lynch and James Bagnall to their former positions of employment, or if those positions no longer exist, to substantially equivalent positions, displacing, if necessary, any employees who may have been hired or reassigned to replace them, without prejudice to their seniority or any other rights or privileges they previously enjoyed;

   (c) Immediately on an interim basis rescind the written warnings issued on January 28, 2022 to employees AJ Parker and Rowan Cummings, and February 4, 2022 to James Bagnall, and not rely on them in assessing any future disciplinary actions;

remove from their employment records, on an interim basis, all references to the said written warnings, and notify these employees, in writing, that the discipline has been rescinded on an interim basis and will not be used against them in any way;

(d) Within seven (7) days, post physical copies of the District Court's Injunction Order setting forth the relief granted at Respondent's Salem, Massachusetts store in English, as well as translations in other languages as necessary to ensure effective communication to Respondent's employees as determined by the Board's Regional Director of Region 1, said translations to be provided by Respondent at Respondent's expense and approved by the Regional Director, on the bulletin board, in all breakrooms, and in all other places where Respondent typically posts notices to its employees at each of its stores; maintain these postings during the pendency of the Board's administrative proceedings free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to agents of the Board reasonable access to each worksite to monitor compliance with this posting requirement;

(e) Within seven (7) days, distribute electronic copies of the District Court's Injunction Order specifying the relief granted, as well as translations in other languages as necessary to ensure effective communication to Respondent's employees as determined by the Board's Regional Director of Region 1, said translations to be provided by Respondent at Respondent's expense and approved by the Regional Director, to all employees employed by Respondent at its Salem store via email, and all other intranet or internet sites or apps that Respondent uses to communicate with employees;

(f) Within seven (7) days, convene one or more mandatory meetings, on working time and at times when Respondent customarily holds employee meetings and scheduled to ensure the widest possible attendance, at Respondent's Salem, Massachusetts stores, during which the District Court's Injunction Order specifying the relief granted will be read to the Unit employees by the Store Manager or a responsible Respondent official in the presence of a Board agent, or at Respondent's option, by a Board agent in the presence of the Store Manager. Respondent shall also afford the Union, through the Regional Director, reasonable notice and opportunity to have a representative present when the Injunction Order is read to employees. Interpreters shall be made available for any individual whose language of fluency is other than English at Respondent's expense. Respondent shall announce the meeting(s) for the Injunction Order reading in the same manner it would customarily announce a meeting to employees; the meeting(s) shall be for the above-stated purpose only. Individuals unable to attend the meeting to which they have been assigned will be able to attend a subsequent meeting during which the same reading shall take place under the same conditions. The Employer shall allow all employees to attend these meetings without penalty or adverse employment consequences, either financial or otherwise; and

(g) Within twenty-one (21) days of the issuance of the District Court's Injunction Order, file with the District Court and submit a copy to the Regional Director of Region 1 of the Board, a sworn affidavit from a responsible official of Respondent setting forth, with specificity, the manner in which Respondent has complied with the terms of the District Court's Injunction Order, including how it has posted the documents required by the Court's decree, including how and where the documents have been posted, and the date(s), time(s), and location(s) that the Injunction Order specifying the relief granted was read to employees and by whom, as required by the Court.

SO ORDERED.

/s/ Myong J. Joun
United States District Judge